(67 South. 197)

No. 19806.

HARVEY et al. v. GARTNER et al.

(April 27, 1914. On Rehearing, Jan. 25, 1915.)

*(Syllabus by the Court.)*

On Rehearing.

1. MALICIOUS PROSECUTION ☞25—RIGHT OF ACTION—FILING PETITION IN BANKRUPTCY.

A petition in bankruptcy filed by bona fide creditors, without malice, without libelous and slanderous charges, with reasonable grounds for believing the allegations contained in the petition, with probable cause, and upon legal advice, although not successfully prosecuted, will not sustain an action for damages in the courts of the state.

[Ed. Note.—For other cases, see Malicious Prosecution, Cent. Dig. §§ 56–58; Dec. Dig. ☞25.]

2. BANKRUPTCY ☞114—CONSERVATORY PROCEEDING—APPOINTMENT OF RECEIVER.

The appointment of a receiver without bond from the petitioners, to take possession of the property of a person charged with bankruptcy, is a conservatory proceeding, instituted for the benefit of the debtor and his creditors, and cannot be likened to the issuance of a writ of attachment by the state courts.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 164–166; Dec. Dig. ☞114.]

3. BANKRUPTCY ☞99—RECEIVER—CONSERVATORY WRIT—DISSOLUTION.

Damages will not be allowed on the dissolution of ordinary conservatory writs, in the absence of statutory authority therefor.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 136, 146; Dec. Dig. ☞99.]

*(Additional Syllabus by Editorial Staff.)*

4. RECEIVERS ☞81—NATURE OF OFFICE.

A receiver is an arm of the court representing the debtor and creditors as well as the court.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 150; Dec. Dig. ☞81.

For other definitions, see Words and Phrases, First and Second Series, Receiver.]

Appeal from Civil District Court, Parish of Orleans; E. K. Skinner, Judge.

Action by Martin W. Harvey and others against Oscar Gartner and others. From the judgment, plaintiffs appeal. Reversed and rendered.

James J. McLoughlin and Hall, Monroe & Lemann, all of New Orleans, for appellants.

Edgar M. Cahn, of New Orleans, for appellees Wilmot Machinery Co. and Gartner. Gustave Lemle, of New Orleans, for appellee A. Baldwin Co., Limited. J. Zach Spearing, of New Orleans, for appellee Palfrey-Rodd-Purcell Co., Limited.

The following is an extract from appellees' brief:

In Ellis, Milbank & Co. v. Fisher, Burgess & Co., 10 La. Ann. 479, it was held:

"Where two parties have judgments against each other, they are bound to compensate, and the execution in either case may be enjoined."

To the extent that plaintiff's judgment was compensated by each judgment rendered in favor of each defendant, it ceased to be. Having no existence, of course no execution could issue thereon against any one.

Plaintiffs' judgment being compensated to the extent of the respective judgments obtained by defendants, execution can only issue for the bal-

ance, and this is what the judge a quo decreed should be done.

Article 2091 of the Revised Civil Code reads as follows:

"There is an obligation in solido, on the part of the debtors, when they are all obliged to the same thing, so that each may be compelled for the whole, and when the payment which is made by one of them, exonerates the others toward the creditor."

The judgment being in solido, under article 2091 of the Revised Civil Code, above quoted, any payment made by any of the debtors in solido exonerates the others toward the plaintiff to the extent of the amount paid.

Pothier on Obligations, p. 152, lays down the following:

"The payment which is made by one of the debtors (in solido) liberates all the others; this is a consequence of the principle, that a debtor, in solido, is only one debtor of the same thing, of which there are several debtors."

"Not only a real payment, but every other kind of payment, ought to have this effect; therefore, if one of the debtors in solido, being sued by the creditor, opposes, in compensation of the debt demanded, a like sum owing to him from the creditor, the other debtors are liberated by this compensation, as well as by a real payment."

"Peter and Paul are my debtors, in solido, of the sum of one thousand pounds. Afterwards I become the debtor of Peter of the like sum. If I sue Peter for the payment of the thousand pounds due me, and he opposes the compensation of the debt due to him, this compensation, as we have seen, being equivalent to a payment, the debt due to me from Peter and Paul becomes extinct, as against them both."

Fuzier-Harman, Répertoire Général Alphabétique du Droit Français (Edition of 1894) vol. 12, under the word "Compensation," No. 126:

"It has been decided that if the codebtor, who can of his own personal right plead compensation, is sued, or if he intervenes in the suit directed against his codebtors to plead compensation, the discharge is acquired by all."

Pandectes Françaises, Nouveau Répertoire de Doctrine de Législation et de Jurisprudence, Rivière, Weiss & Frennelet (Edition of 1893), Obligations, No. 459:

"The character of the exception based on compensation, as exception of release of debt, cannot be determined 'a priori.' It would appear that compensation, likened theoretically to double imaginary payment, ought to produce in the matter of solidarity the same effect as payment. It is just that which happens when the creditor of the debt in solido at the outset (at first) demands payment from that one of the codebtors to whom he himself is a debtor, and he is met with the plea of compensation. If the creditor then attempts to claim payment of the debt from the other codebtor, he has the right to apply to the creditor that the debt extinguished by the compensation pleaded by his consort (codebt-

or) has been at the same time extinguished in regard to him. Compensation, as we are going to see, which furnishes only a personal exception, becomes here a common exception."

Paillet, Manuel de Droit Français, commenting on C. N. 1294 (our C. C. 2211), 7th Ed., p. 525, says:

"Whenever one of the solidary codebtors, to whom is due something by the creditor, has himself used the means of compensation to have the debt, for which he is held as a solidary obligor, declared extinguished, all the other solidary codebtors may take advantage of that fact to prove that the debt can no longer be claimed from them. The effect of the compensation is necessarily to terminate the action of the one who was originally the creditor, otherwise there would be a contradiction in recognizing in him again to recover it," etc.

Pothier on Obligations, p. 152, has the following:

"While article 1294, C. N. (R. C. C. 2211), does not permit a solidary obligor to oppose as compensation the sums which the creditor owes to his codebtor, it does not follow that the solidary obligor is not able to take advantage of a judgment in favor of his codebtor which has already pronounced the compensation."

PROVOSTY, J. This suit is in damages for loss of property and injury to credit and reputation, alleged to have been suffered by plaintiffs as the result of proceedings in involuntary bankruptcy instituted against them by the defendants, in the course of which a receiver was appointed to take possession of the property. The plaintiffs are the firm of Martin W. Harvey & Co., and Martin W. Harvey individually; said firm being alleged to be composed of Martin W. Harvey and Howard Segrave.

An exception of want of proper parties was interposed, based upon the fact that the partner, Segrave, is not individually a party to the suit. This exception was properly overruled. The suit is by the partnership and by Martin W. Harvey; both of them perfectly competent persons to stand in judgment without the assistance of Segrave. Individually, Segrave has no cause of action; he having consented to the proceedings in bankruptcy.

Pleas of res judicata and estoppel also were filed. They are founded upon the fol-

lowing facts: After the termination of the proceedings in bankruptcy by the rejection of the petition in bankruptcy, the plaintiff firm took a rule on the receiver to show cause why he should not return its property of which he had taken possession; and, when the receiver applied for his discharge and the cancellation of his bond, the plaintiff firm filed an opposition, alleging that he had not accounted for said property. There was judgment overruling this opposition, and discharging the receiver. It is that judgment which is said to be res judicata of the present suit.

That judgment passed merely upon the liability of the receiver, and in no wise upon the liability of the present defendants. The rule upon the receiver, as well as the opposition to his discharge, was a mere calling upon that officer to give an account of his stewardship. In making his defense to them, the receiver was representing exclusively himself, and in no wise the present defendants. The suit in the instant case is a calling upon the defendants themselves, and it is to respond in damages for having instituted the proceedings in bankruptcy and caused a receiver to be appointed. Hence neither the cause of action, nor the parties, nor the thing demanded, can be said to be the same in the present suit as in these former proceedings; and, as a consequence, the judgment in these former proceedings is not res judicata of the present suit.

The estoppel is said to result from the fact that plaintiffs demanded of the receiver the return of the property. This plea is so devoid of legal foundation that one hardly knows how to get about arguing it. In the exercise of their right to recover back their property or its value, the primary recourse of the plaintiffs was against the receiver who had taken possession of it, and, in legal contemplation, still had it in possession. So long as the receiver had the property in pos-

session, these plaintiffs certainly could not have a cause of action in damages against the present defendants for the loss of it. How, then, can the legal efforts of these plaintiffs to recover this property from the receiver operate as an estoppel to the present suit. Instead of a bar it was rather in the nature of a prerequisite.

In support of this plea of estoppel the defendants cite High on Receivers (4th Ed.) p. 319, § 270, to the effect that the litigant, at whose instance a receiver has been appointed, is not liable for property lost through the fault of the receiver. Grant that this is good law, the plaintiffs are not suing for any losses suffered through the fault of the receiver, but for losses suffered without the fault of the receiver—losses which he could not avoid, but for which the defendants are alleged to be liable by reason of the same having been the direct consequence of their act in wrongfully instituting bankruptcy proceedings and causing a receiver to be appointed. If, by reason of having to be sold at forced sale for whatever was bid, at a time of great financial depression, when there was no market for that kind of property, the movables of the plaintiff firm, of which the receiver took charge, had to be sold for a mere song, and, if, by reason of its being in the hands of a receiver, the sawmill of the plaintiff firm could not be insured, these were matters for which the receiver was in no way at fault, and for which he was in no wise responsible, but which came about as the direct consequence of the bankruptcy proceedings instituted by these defendants, and of the appointment of a receiver made at their instance, and for which they may well be responsible, notwithstanding the blamelessness of the receiver.

On the merits, the facts are as follows: The firm of Martin W. Harvey & Co. was originally composed of Martin W. Harvey, L. C. Heintz, and James L. Reid. It was

formed in February, 1907. It was a sawmill concern, and owned a sawmill plant, timber lands, oxen, and wagons. After it had been in existence some six months, and had accumulated a considerable amount of lumber on its yard, and contracted debts, Harvey, in August, 1907, bought out the interest of Heintz and Reid, and took Segrave as a partner. The purchase price was $2,500—$625 cash, and $1,875 credit, for which Harvey gave his note. On October 10, 1907, the partnership, by way of security for the payment of this note, made a redeemable sale to Heintz and Reid of all its timber lands, oxen, and wagons, reserving, however, the possession and use of this property, and agreeing that payment should be made on the $1,875 note at the rate of $2.50 for every thousand feet of lumber sold. At that time the financial crisis of that year was on, and owing to the business depression resulting therefrom, the firm found itself unable to dispose readily of the lumber it was accumulating on its yard or to collect its accounts, and in consequence found itself financially embarrassed. Its largest creditor was the defendant, Oscar Gartner, who had been furnishing it money to run with. It then entered into a written agreement with Gartner, by which the latter undertook to act as trustee and take possession of all the property of the firm, and operate the mill and dispose of the lumber, in the interest of the creditors; and, under this agreement, he actually took possession. Certain of the creditors, however, would not join in this arrangement, and brought suit; and this led to an application for a respite. This application was filed on February 28, 1908. The defendant Gartner furnished $50 towards the expenses of it. On March 8, 1908, he filed the petition in involuntary bankruptcy, having induced the other defendants to join him in it, and given them, in order to induce them to do so, a written

guaranty to hold them harmless against all claims for damages; they having no knowledge of the facts of the matter, and relying entirely upon his representations. The respite proceedings were still pending. They culminated in the respite being granted on April 8, 1908. On March 9th, the day after the filing of the petition in bankruptcy, the defendants filed a petition alleging that the appointment of a receiver was necessary, and asking that one be appointed. This prayer was granted, and a receiver was appointed; and he took charge of all the property which the plaintiff firm had turned over to the defendant Gartner, as trustee, except the part included in the redemption sale. The fire insurance companies canceled their policies on the sawmill, for the reason that it had passed into the hands of a receiver, and the receiver was unable to obtain insurance. On March 24, 1909, judgment was rendered dismissing the bankruptcy proceedings. In the meantime, the sawmill had burnt down without insurance, and the receiver had had to sell all the movables at auction sale for whatever they would bring for cash. Plaintiffs first exhausted their remedy against the receiver, and then brought this suit.

The receiver, by authority of the court, took possession of the property of the plaintiff firm against its will in precisely the same way that a sheriff does under a writ of attachment or sequestration. From that moment, the plaintiff firm was as powerless to protect or preserve the property or interfere with it as if an injunction had issued against its doing so. "The appointment of a receiver," says 34 Cyc. 17, "is an equitable remedy which bears a similar relation to courts of equity that proceedings in attachment bear to courts of law. Hence the appointment of a receiver has been stated to be an equitable injunction or attachment, although it is also said to be in the nature, not

of an attachment, but a sequestration." Inasmuch as the defendants caused the receiver to be appointed, the plaintiff firm contends that they should stand in responsibility for the loss of said property precisely as does a plaintiff in writ when an attachment or sequestration is dissolved.

Defendants, on the other hand, contend that this would be the case only if the appointment of the receiver had been made under section 3e of the bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 546 [U. S. Comp. St. 1913, § 9587]); that is to say, upon bond being furnished, and not under the general equitable powers of the court, without bond being furnished.

We do not see what the nonfurnishing of the bond has to do with it. Damages for the wrongful issuance of an attachment or sequestration would be due none the less if an attachment or sequestration bond had not been furnished. The nonfurnishing of bond for obtaining the writ would appear to us to be in the nature of an aggravation of the situation. What would have been the legal situation if the court had made the appointment of its own motion, we will not undertake to say, but it made it upon the allegations, affidavit, and express prayer of these defendants.

The trial court allowed the plaintiff firm $8,000 for the sawmill burnt down without insurance, and nothing for the lumber which was taken charge of by the receiver and sold at a sacrifice price. This lumber was appraised at $1,000, and we think the plaintiff firm is entitled to at least that much for it. Defendants contend that the allowance of $8,000 for the mill is excessive. We do not so find from the evidence. The plaintiff firm, then, should have judgment for $9,000, less $770.14 accounted for by the receiver.

The plaintiff firm would seek to hold defendants liable, not only for the property taken possession of by the receiver, but also for the property turned over to Gartner as trustee. But this cannot be, as the present suit is not one for an accounting, but for damages resulting from the bankruptcy proceedings.

As actual damages, in addition to the property losses, the plaintiff firm claims $2,000 attorney's fees. Attorney's fees could not be allowed for defending the bankruptcy suit, nor for prosecuting the present suit, since attorney's fees are not allowed for prosecuting or defending ordinary suits. They are allowed for obtaining the release of property from seizure, but only where the services in that connection are rendered separately from those rendered in the main suit. In other words, only where the release of the property is obtained by means of a separate proceeding, and not as the result of the termination of the main suit, to which the seizure was ancillary. All this is so abundantly settled in our jurisprudence that citation of the decisions to that effect cannot be necessary.

The trial court properly rejected also the claim of damages for injury to reputation and credit. The bankruptcy proceedings were instituted on the advice of counsel, which is in itself a good defense if Gartner in good faith laid the facts before the counsel; and we have no sufficient reason to think that he did not do so. It is said that the plaintiff firm was in fact solvent, and that defendant Gartner knew this, since he was familiar with its affairs. But the solvency of the firm was not so very clear; there were large debts; and, while there were assets, there was no market for them; and they were not so large but that opinions might differ on the point of whether their actual, present value exceeded the debts. It is said that Gartner's knowledge of this solvency is conclusively shown by the fact that the respite proceedings were predicated on the assumed solvency of the plaintiff firm, and that he co-operated with the plaintiff firm in said proceedings. We see nothing conclusive in this. A business man may be

hopeful of a certain business situation one day and not be so confident a week or ten days later. Especially if he makes new discoveries, as, we suspect strongly, Gartner did in this case. Except the statement of Harvey, that Segrave represented Gartner, and kept the books of the firm, we find absolutely nothing in the record to show that Gartner, at the time the application for a respite was made, had any knowledge, or even suspicion, of this redemption sale having been made. The schedule of assets filed with the petition for a respite, and duly sworn to by both Harvey and Segrave, makes no mention of this redemption sale, but carries the property thus sold as still belonging to the firm. There is no reason to suppose that Segrave was more communicative to Gartner, with regard to this redemption sale, than he was to the court. In the absence of all suggestion of ill will or express malice, the fact that Gartner was so confident of his case in the bankruptcy proceedings that he was willing to undertake to hold his cocreditors harmless against afterclaps affords a strong inference of his good faith.

In their several answers to plaintiffs' petition, the defendants prayed for judgment against the plaintiff firm for the amounts due them respectively by it; and the trial judge, in the same judgment in which he condemned the defendants, in solido to pay the plaintiff firm $10,000, condemned the plaintiff firm to pay to them the amounts due them respectively; and he went on and decreed that the sum, or aggregate amount, of those several judgments in favor of defendants should extinguish in an equal amount by compensation the judgment of the plaintiff firm.

The plaintiff firm complains of this lumping of the judgments; but we do not see that it has any ground for doing so. What difference can it make whether the extinguishment of its judgment by compensation, which results by operation of law, is effected by these judgments separately or together. The extinguishment is just as effective and complete and final in the one case as in the other.

Counsel say that "as a practical proposition this result does injustice to the general creditors of Harvey & Co. by making it impossible to collect the solidary judgment in their favor from the responsible defendants."

But surely counsel would not want to collect an extinguished judgment, or the extinguished part of a judgment. When, in the same judgment, Harvey & Co. is condemned to pay to Oscar Gartner $6,696.23, and Oscar Gartner is condemned to pay to Harvey & Co. $10,000, compensation takes place by operation of law and the $10,000 judgment is extinguished completely and finally up to $6,696.23, and continues to exist only for the balance of $3,303.77, and execution can issue only for this balance. And, as with the judgment in favor of Gartner, so with the judgments in favor of the other defendants; each extinguished by compensation, to an amount equal to itself, the judgment of the plaintiff firm. "Compensation," says article 2208, C. C., "takes place of course by the mere operation of law, even unknown to the debtors; the two debts are reciprocally extinguished, as soon as they exist simultaneously, to the amount of their respective sums."

Counsel quote article 2211, C. C., to the effect that one debtor in solido cannot oppose in compensation what the creditor owes to his codebtor. But nothing of the kind is being done in the present case. In the present case each debtor is opposing in compensation the debt due to himself. This article 2211 can have application only where a debtor in solido is being sued separately. It can have none where all the debtors in solido are being sued together, and the debts to be compensated are all embraced in the same judgment. See extract from defendants' brief given in margin.

The judgment appealed from is affirmed, except that, in so far as it is in favor of

plaintiffs, it is reduced from $10,000 to $8,230. The costs of appeal to be paid by plaintiffs.

O'NIELL, J., takes no part.

### On Rehearing.

SOMMERVILLE, J.   The firm of Martin W. Harvey & Co. was organized February 1, 1907, to engage in owning and operating a sawmill in St. Tammany parish, La.; and it went into operation April 1st of the same year. The partners were Martin W. Harvey, who had a one-half interest, Dr. Louis Heintz and James L. Reid, with a one-fourth interest each. Harvey contributed a secondhanded boiler and some machinery, together with a small amount of lumber, valued at about $2,000, to the partnership; and the other two partners contributed $1,000 each. Oscar Gartner, the principal defendant in this suit, made loans and advances to the firm in the sum of about $6,696.23, under a written contract, of date February 21, 1907, wherein the firm pledged to him, as security, "all lumber and logs on hand at the said mill, or adjacent thereto, or to be manufactured thereat, and also the mill buildings, mill machinery, dry kilns, teams, etc., used in conjunction with said sawmill."

In August, 1907, Heintz and Reid withdrew from the firm, after they received from the firm a check for $625 and a note for $1,875, making $2,500, for their interests. Howard A. Segrave became a partner in the firm, to the extent of a one-eighth interest, in August, 1907; M. W. Harvey being the owner of the other seven-eighths. James L. Reid testified that he sold his interest to Segrave for $1,250, although, according to his testimony, he, together with Dr. Heintz, had received $2,500 for their joint interest in said partnership from that partnership. The new firm retained the name of the old firm. October 10, 1907, the new firm sold to James L. Reid and Dr. Louis G. Heintz all of the standing timber around the mill, all the contracts and leases that it held from the Greenlaw Lumber Company, the ox teams and wagons, all of which were used in connection with the sawmill, for $1,875, the amount of the promissory note which was formerly issued to these gentlemen by said firm, in part payment of what they had invested in the firm as partners; and they acknowledged due delivery of the property sold to them. This act of sale contained a right of redemption within six months by paying to the purchasers the purchase price, with interest at the rate of 8 per cent., and all costs of transfer. The act provided:

"If said property is not redeemed within six months the said purchasers are to be the absolute owners of said property."

The property was not redeemed within the specified time. October 18, 1907, Heintz and Reid sold this same property to Jos. Rauch for $1,875, subject to the right of redemption reserved to M. W. Harvey & Co. October 19, 1907, the firm entered into a contract with some of its creditors, wherein it was stated that the firm is "financially embarrassed and is temporarily unable to pay its debts and comply with its obligations." And it was agreed that a trustee should be appointed to take charge of the business of said firm and administer its affairs. This agreement was not to be binding or effective until all creditors of the firm had signed it. All the creditors did not sign, although Mr. Gartner, the largest creditor, went into possession of the property temporarily as trustee for all concerned. He was required to take an inventory of all the assets of the business; he was to operate the mill and sell the output of lumber to the best advantage; but the creditors of the firm were not informed that the firm had already parted with most of its assets by transferring to the two retiring partners, Heintz and Reid, all of the assets, except

the sawmill and about $500 worth of lumber. The mill was not operated by Mr. Gartner, the trustee. An offer was made to him, while acting as trustee, which he thought advantageous to the creditors of the concern, whereby a lease might be effected, with an option to purchase for $7,500 the entire property, including the standing timber, etc., which had been sold to Reid and Heintz, which, in turn, had been sold to Rauch. But Reid and Heintz refused to return the property transferred to them without payment of the $1,875; and the offer could not be accepted.

February 22, 1908, M. W. Harvey & Co., alleging their "inability to collect accounts due them promptly, and by reason of the unusual depression and stagnation in business (the panic of 1907 was on), and their inability to dispose of their stock in trade and other assets rapidly enough in due course of business to meet maturing obligations, and by reason of losses sustained by them in the course of said business, petitioners are not at present able to meet their obligations;" and they asked for a respite of one year. To their petition they attached a schedule of assets amounting to $14,200, and of liabilities amounting to $12,767.04. In the list of assets were placed the standing timber, valued by them at $3,000, and the oxen and wagons at $1,200, which had been sold to Heintz and Reid nearly a year before; and the time for redeeming them had expired. And among the liabilities were placed Reid and Heintz for $1,875, although they had been settled with. Harvey advanced the costs of the respite proceeding.

Before the order for respite was granted, March 9, 1908, five of the creditors of the firm of M. W. Harvey & Co., among whom was Oscar Gartner, petitioned the United States District Court to adjudge the firm, and the members thereof, bankrupts. All of the members of the old firm of M. W.

Harvey & Co., as well as the members of the new firm, were made parties defendant. There was a trial, with the verdict that:

"We, the jury, find that the firm of M. W. Harvey & Co., composed of Martin W. Harvey and Howard A. Segrave, was solvent, within the intent and meaning of the bankruptcy law, on the 9th day of March, 1908, and had not committed an act of bankruptcy within the intent and meaning of the bankruptcy law."

There was judgment holding that the original firm of M. W. Harvey & Co. had been dissolved August 10, 1907, and that the new firm of Martin W. Harvey & Co. was formed subsequently, consisting of Martin W. Harvey and Howard A. Segrave, of which neither Reid nor Heintz were members; and it was decreed that the petition of the plaintiffs be dismissed, with costs, reserving to respondents their rights to sue for damages, if any they had.

In their petition to have the firm of M. W. Harvey & Co. and the individual members thereof declared bankrupts, the petitioners set forth the different acts of the firm hereinbefore mentioned, and introduced documentary evidence in support thereof. And, in addition thereto, there was filed an answer by Howard A. Segrave, one of the members of said firm, in which he admitted the inability of said firm, and the individual members thereof, including himself, to pay their debts; and he expressed a willingness that he and the partnership should be adjudged bankrupts; and he joined in the prayer of the petitioners.

This written admission on the part of Segrave for himself and his firm was an act of bankruptcy; but the jury and the court neglected to adjudge him a bankrupt.

Martin W. Harvey, individually, and Martin W. Harvey & Co., composed of Martin W. Harvey and Howard Segrave, bring this suit sounding in damages against Oscar Gartner and four others, all of whom were creditors and petitioners in the bankruptcy proceed-

ing before referred to. They allege that these defendants petitioned the United States District Court to have them declared bankrupts, and asked for the appointment of a receiver, who took possession of their property; and that they opposed the bankruptcy proceedings. And they further allege that defendants filed said proceedings "wantonly and with malice"; and that the petition therein filed "constitutes a libel and slander upon the reputation of your petitioners as well as upon the business reputation, credit, and character of your petitioners, and your petitioners show that the allegations of the said petition and affidavit are untrue and unfounded," and they claim damages in the sum of $24,000, divided as follows: For loss of property, $12,000; loss of profits, $5,000; fees of counsel in the bankruptcy court, $2,000; and for damages to petitioners' credit, character, reputation, and business standing, $5,000. A supplemental petition was filed by the same parties reciting that a verdict and judgment had been rendered in the bankruptcy proceeding dismissing same.

The record shows that the partnership of M. W. Harvey & Co. has been dissolved. The object of the partnership was the running of a sawmill, and that sawmill has been destroyed by fire; all the assets of the firm have been disposed of; and one of the partners, Howard Segrave, is a bankrupt, as declared by him in the bankruptcy proceeding in his answer to the petition filed in that cause. The only real party plaintiff is M. W. Harvey.

Petitioners do not set forth any averment of the petition in bankruptcy filed by these defendants which was libelous and slanderous. And it does not contain such. The language therein used is decorous and proper; the allegations thereof are material; and the lines of the statute were followed very closely. But plaintiffs allege that the filing of said petition was done "wantonly and with

malice, and constitutes a libel and slander against the reputation of your petitioners," etc. And it is argued by them that it is unnecessary to show malice on the part of defendants to sustain their suit for damages.

They are not proceeding under section 3e of the bankruptcy law, which provides in part that:

"If such petition be dismissed by the court or withdrawn by the petitioner, the respondent or respondents shall be allowed all costs, counsel fees, expenses, and damages occasioned by such seizure, taking, or detention of such property. Counsel fees, costs, expenses and damages shall be fixed and allowed by the court, and paid by the obligors in such bond."

The section further provides that, where the petition asks that the property of defendant be taken charge of and held pending a hearing of the petition, the petitioner must give bond with good and sufficient surety.

The petitioners in the bankruptcy court did not ask, in their petition to have the now plaintiffs declared bankrupts, that the property should be taken charge of by the marshal; and no bond was given by them for such an order. The petitioners there pursued the usual course of filing a separate petition, on the same day that the original petition was filed, in which they asked that a receiver might be appointed. This receiver was appointed by the court, and he took possession of the property of the defendants, without the plaintiffs in the suit being required to give any bond.

Petitioners are proceeding under the state law which provides that whatever act of man that causes damage to another obliges him by whose fault it happened to repair it; and they are asking for alleged actual damages and attorneys' fees for defending them in the bankruptcy court.

The bankruptcy court is authorized in the bankruptcy law of July 1, 1898, to "appoint receivers or the marshals, upon application of

parties in interest, in case the courts shall find it absolutely necessary, for the preservation of estates, to take charge of the property of bankrupts after the filing of the petition and until it is dismissed or the trustee is qualified." Section 2 (3) (U. S. Comp. St. 1913, § 9586). The statute does not require, although the court may order, that petitioners shall give bond when a receiver is applied for and appointed; but a bond is required of the petitioners when they ask that the marshal be put in possession of the property of the alleged bankrupt. Section 3e and section 69a (sections 9587, 9653).

If this suit for damages and counsel fees were in the bankruptcy court, and on a bond given by the petitioners there in accordance with the bankruptcy law and an order of court, the cause of plaintiffs would be controlled by the terms of that statute. It has been held by the Supreme Court of Illinois in Hill v. U. S. Fidelity & Guaranty Co., 250 Ill. 242, 95 N. E. 150, that damages were recoverable on a bond given by a creditor on the appointment of a receiver in bankruptcy, who had been appointed on an order wrongfully obtained. The court held that the law applied alike to the bonds given by petitioners for receivers and for marshals in bankruptcy proceedings.

A decision to the contrary was rendered In Re Moehs & Rechnitzer (D. C.) 174 Fed. 165, in a suit on a bond given for the appointment of a receiver, where the petitioners acted without malice and with probable cause.

This present suit is not on a contract or bond given in a bankruptcy proceeding. The provisions of the bankruptcy law are not invoked by plaintiffs. Congress has authorized the courts of bankruptcy to allow to respondents in bankruptcy suits, where the petition is dismissed or withdrawn, "all costs [counsel fees], expenses, and damages occasioned by such seizure, taking and de-

tention of such property," where bonds have been required and given for such seizure.

And the action of Congress in allowing damages in the case referred to is persuasive with the court, but the statutes and jurisprudence of this state must govern in disposing of this cause.

We do not think that plaintiffs can recover under the state statutes. And it has been held, with direct reference to the bankruptcy act, by the District Court, S. D. New York, in Re Ghiglione, 93 Fed. 186, that counsel fees could not be recovered in the case where application was made for a receiver and was denied.

[1] Plaintiff alleged that the defendant acted wantonly and with malice. The allegation is necessary to sustain the action. Malice, express or implied, and the want of probable cause, must both concur in actions of this kind. The suit is in the nature of a suit for damages for a malicious prosecution; and an action for instituting a civil suit of that nature requires not less for its maintenance than an action for a malicious prosecution of a criminal proceeding. The trial judge ignored totally the question whether the conduct of the now defendants had been attended by malice, though the now plaintiffs charge malice in their petition; and he denied all importance to the necessary inquiry, whether the now defendants had probable cause for their action or not.

The plaintiffs in the bankruptcy court proceeded with firm and reasonable belief that they had a just claim, a lawful right to resort to that court; and their failure in that court cannot render them responsible in damages for the consequences of their acts. Their conduct must be weighed in view of what appeared to them when they filed their petition in the bankruptcy court, not in the light of subsequently appearing facts. If they had reasonable cause for their action

they cannot be held in damages because of their failure. That they had reasonable cause to believe that acts of bankruptcy had been committed must be conceded in view of the statements in the answer of Howard Segrave, a partner in the partnership of Martin W. Harvey & Co., before narrated. It was proved that the partnership was actually dissolved by the withdrawal of two partners, and by their taking assets of the firm, amounting to $3,000 or over, in return for what they had put into the firm, the sum of $2,000. That property was the pledge of the firm's creditors, and they should not have taken it from the firm of which they were members. That act, although concealed from the creditors of the firm, may not have been a technical act of bankruptcy, inasmuch as it occurred October 10, 1907, more than four months before the date of the bankruptcy proceeding, March 9, 1908. Such action would have been an act of insolvency under the state law, for it was passed within less than a year of the date of the bankruptcy proceeding.

The act of sale, with the redemption provision, just referred to, is called by the parties an act of security. If it was intended to act as an act of security, and the property did not actually become the property of Reid and Heintz until the period of redemption had expired, April 10, 1908, then plaintiff "transferred, while insolvent, any (a) portion of his property to one or more creditors with intent to prefer such creditors over his other creditors," and such was an act of bankruptcy, under the provisions of the bankruptcy law.

Again, it was shown that the plaintiff firm entered into a contract with a trustee, to whom it assigned all of its property and assets for the benefit of its creditors, some five months before the date of bankruptcy; and this transfer was made to said trustee, who is the main defendant in this cause, and the principal creditor of the firm, with-

out informing him and the other creditors that the standing timber, contracts, etc., upon which the sawmill depended for its existence, and much of which had been pledged to him for money advanced, had been transferred to the two retiring members of the firm. But this was not within four months of the bankruptcy proceeding.

The evidence shows that a petition of respite was filed in the state court of St. Tammany parish within one month before the bankruptcy proceedings were filed. In that petition, as well as in the agreement to appoint a trustee, it was recited:

"That owing to the inability to collect accounts due them promptly, and by reason of the unusual depression and stagnation in business, and their inability to dispose of their stock in trade and other assets rapidly enough in due course of business to meet maturing obligations, and by reason of losses sustained by them in the course of said business petitioners are not at present able to meet their obligations, but that they have ample means to do so, and their liabilities (assets) largely exceed in value the amount of their liabilities."

The stringency of the money market in 1907; the fact that M. W. Harvey & Co., a new firm, depended upon Oscar Gartner, defendant here, to advance it more than $6,000, where he had contracted to advance $3,000; the transfer of the property pledged to Gartner for money advanced by him; the withdrawal of two partners from the firm and taking by them of $3,000 worth of property, when their interest in that firm was only $2,000, and the creditors were not paid; the declaration of the firm that they were unable to meet their obligations; the listing of certain property in respite proceedings as assets after the said property had been sold to the two retiring partners; the absolute knowledge on the part of Gartner that the firm was insolvent; the written admission by one of the partners that he and the firm were insolvent; that under section 1804, R. S., these acts constituted presumptive evidence of fraud, on the part of the firm, taken together with the testimony of Edgar M.

Cahn and Gustave Lemle, two reputable members of the state bar, to the effect that they, after consideration and consultation, advised these defendants that plaintiffs had been guilty of acts of bankruptcy—are, taken together, convincing that defendants here proceeded in the court of bankruptcy against plaintiffs here without malice, believing their allegations to be true, and with reasonable and probable cause.

In a somewhat similar suit for damages because of an involuntary proceeding in bankruptcy which was dismissed, the Supreme Court held, prior to the adoption of the bankruptcy law of 1898, that, the defendants having acted bona fide upon legal advice, their defense was perfect. Stewart, v. Sonneborn, 98 U. S. 187, 197, 25 L. Ed. 116.

Plaintiffs here were really insolvent at the date of the bankruptcy proceeding under the definition of insolvency in the bankruptcy law. It says in section 1 (15) (U. S. Comp. St. 1913, § 9585):

"A person shall be deemed insolvent within the provisions of this act whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, or removed, or permitted to be concealed or removed, with intent to defraud, hinder, or delay his creditors, shall not, at a fair valuation, be sufficient in amount to pay his debts."

Petitioners filed a schedule of their assets and liabilities February 22, 1908, which showed their liabilities to be $12,767.04 and their assets $14,200. But they had conveyed timber and ox teams appearing in the list of assets at a valuation of $4,200, which had been conveyed to Reid and Heintz. The sawmill was valued at $8,000, which did not apparently cost quite $4,000, and which was worth much less after the sale of the standing timber around it; and the ox teams. The mill was not being operated at the time of the filing of the bankruptcy proceeding; and its value was very small. Plaintiffs did not have property sufficient to pay their debts, at a fair valuation. They were insolvent.

[2] Plaintiffs argue that a bankruptcy proceeding, amended by an application for the appointment of a receiver, carries with it the same responsibility as where an attachment was wrongfully issued on an application to the courts of this state.

In this state, the law with reference to the issuance of attachments is not the same as that with reference to the appointment of receivers. The writ of attachment is usually taken against absconding, concealed, or fraudulent debtors, and the sheriff is directed to take possession of the property and hold it for the plaintiff in the cause.

The law with reference to receivers is different. A receiver may be appointed on the request of the majority of the stockholders of a corporation, or for mismanaging the business, for committing acts ultra vires, for wasting, misusing, or misapplying the property of a corporation, or where the property of the corporation is abandoned, or for insolvency, or where the property has been seized, or is under judicial process by fraud or collusion, or where the corporation has been adjudged not organized according to law, and for other reasons.

[4] It is not necessary for the appointment of a receiver that a creditor shall have absconded, or concealed his property, or committed fraud. The receiver is the arm of the court. He represents the debtor and all of his creditors, as well as the court. Such appointment does not necessarily carry disgrace with it, or disaster, or even damage to business.

The appointment of receivers may be likened to the judicial sequestration ordered ex officio by the judge, under article 274, C. P. Receivers are appointed in the interest of all parties to the litigation; and the right to appoint is vested in the court for the purpose of preserving the property in dispute.

The receiver in this case was appointed without requiring a bond to be given by the petitioners; and the property of the defend-

ants in the cause was given into the possession of said receiver. All was done by the judge of the bankruptcy court in the exercise of the discretion vested in him. And, as the defendants were insolvent, no bond would have been required for the issuance of a writ of sequestration in the state court. C. P. 278.

It is observed that the jury in the bankruptcy court found that M. W. Harvey & Co. were solvent. But the evidence in the record before us is quite conclusive of their insolvency at the time that the bankruptcy proceeding was filed. The remedy sought by plaintiff in the bankruptcy court was invoked in good faith, without malice, with probable cause, and upon legal advice; and no injury resulted for which the petitioners are responsible, though the jury there found that plaintiffs did not present sufficient cause, and that suit failed.

[3] Parties are not permitted to recover damages for setting aside conservatory writs, which may have been acquired in good faith, upon reasonable grounds, and for probable cause. Nuzum v. Gore, 24 La. Ann. 208; Duncan v. Wise, 39 La. Ann. 74, 6 South. 13.

It is therefore ordered, adjudged, and decreed that the judgment appealed from in favor of plaintiff be reversed; that there be judgment in favor of defendants and against plaintiffs, dismissing their suit; and that there be judgment in favor of defendants on their reconventional demands as prayed for by them—costs to be paid by plaintiff.